

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------X
                              :

MAYSA ABDEL-RAZEQ,                 :        Civil Action

             Plaintiff,     :

                              :

          v.               :        **COMPLAINT**

                              :        **JURY TRIAL DEMANDED**

ALVAREZ & MARSAL, INC., PAUL    :
AVERSANO, in his individual and professional
capacities, ANTHONY CAPORRINO, in his     :
individual and professional capacities, and JOEL
PORETSKY, in his individual and professional   :
capacities,
                              :

             Defendants.   :

                              :
--------------------------------------------------------------X

      Plaintiff Maysa Abdel-Razeq ("Plaintiff"), by and through undersigned counsel, Wigdor

LLP and Goodstadt Law Group, PLLC, as and for the Complaint in this action against

Defendants Alvarez & Marsal, Inc. ("A&M" or the "Company"), Paul Aversano ("Mr.

Aversano" or "Defendant Aversano"), Anthony Caporrino ("Mr. Caporrino" or "Defendant

Caporrino") and Joel Poretsky ("Mr. Poretsky" or "Defendant Poretsky") (collectively,

"Defendants"), hereby alleges as follows:

## NATURE OF THE CLAIMS

      1.    Plaintiff Maysa Abdel-Razeq, a single mother and two-time cancer survivor, has

been forced to endure years of working in a pervasive and severe hostile work environment

defined by endless offensive, degrading, racist and sexually harassing comments at the hands of

her boss, Paul Aversano, culminating in a campaign of retaliation against her after she refused to

entertain Mr. Aversano's sexual advances any longer.  Even the Company's General Counsel,

Joel Poretsky, who is in charge of ensuring no employee is retaliated against for engaging in

such protected activity, has joined this campaign, publicly declaring in the Company's office that he now intends to "make her life miserable" following Ms. Abdel-Razeq's decision to seek legal representation. As mere examples of the harassing and discriminatory comments Mr. Aversano made throughout Ms. Abdel-Razeq's employment, Mr. Aversano openly referred to African-Americans as "**niggers**" and African-American children as "**nigglets**" in front of other A&M employees, including Ms. Abdel-Razeq, whose son is half African-American, warned Ms. Abdel-Razeq that he hoped she was "**not like Kim Kardashian – a nigger lover**" and consistently referred to Jews as "Canadians," in an anti-Semitic generalization that Jewish people are cheap, one time even joking, "**I am sitting next to a hard core canadian who is reading the torah, drinking a diet coke and eating twizzlers. Seriously.**" Moreover, demonstrating Mr. Aversano's belief that he was immune to any discipline at the Company, Mr. Aversano also brazenly sent Ms. Abdel-Razeq harassing emails on the Company's email network. Indeed, by way of example only, Mr. Aversano asked Ms. Abdel-Razeq over Company email if she wanted to get a "**couples massage?**" and told Ms. Abdel-Razeq, "**I'm just praying you don't quit or get married!**" and "**As long as you never lie to me or steal from me[,] you'll always have my love…**"

2.     Furthermore, Mr. Aversano subjected Ms. Abdel-Razeq to endless verbally harassing and discriminatory comments throughout her employment at the Company, including, but not limited to: "**Your body is like a Coca-Cola bottle**," "**You are a Middle Eastern Queen, but I prefer to call you a Brazilian Queen so I prevent myself from liking a terrorist**," "**Your hips are perfect for carrying babies**" and "**I will leave my wife for you, but I am worried that you would cheat on me.**" Over time, Mr. Aversano's comments became more explicit, including exclaiming to Ms. Abdel-Razeq, "**Damn those watermelons!**,"

referring to her breasts, and telling her, **"The first time we have sex would be for 30 seconds because I would be too excited, and then we would go for 3-4 hours."**

3.     On January 30, 2014, Ms. Abdel-Razeq's 30th birthday, the blatant sexual harassment, discrimination and retaliation campaign Mr. Aversano waged against Ms. Abdel-Razeq escalated to an emotional breaking point.  Immediately upon returning from a celebratory birthday lunch, during which Mr. Aversano made numerous sexually harassing comments towards Ms. Abdel-Razeq in front of several coworkers, including Mr. Caporrino, Mr. Aversano called Ms. Abdel-Razeq into his office – with the door wide open for all coworkers to hear the ensuing – and once again tried to wield his supervisory power over her to force her to succumb to his sexual desires.  Unable to be subjected to his sexual advances any longer, Ms. Abdel-Razeq shouted, **"Stop it!  I can't take it anymore!,"** to which Mr. Aversano shouted, **"Fuck you!,"** as he slammed his office door and Ms. Abdel-Razeq returned to her desk in tears.  Over the next few weeks, Mr. Aversano, in concert with Mr. Caporrino, immediately began waging a crusade of retaliation against Ms. Abdel-Razeq, including reporting her to Human Resources ("HR") for trumped up claims of unprofessional behavior and performance deficiencies.  Deplorably, despite Ms. Abdel-Razeq's explicit complaints to HR in the weeks following regarding Mr. Aversano's years of sexual harassment and discrimination, HR chose to punish Ms. Abdel-Razeq rather than the true wrongdoer, Mr. Aversano, whom they have actively sought to protect.

4.     As a result of the hostile work environment caused by the incessant sexual harassment, sexual advances, racist and anti-Semitic comments of Mr. Aversano, as well as the retaliation to which she has been subjected in response to her protected complaints regarding his despicable treatment, Ms. Abdel-Razeq has suffered – and continues to suffer – from severe

emotional distress, culminating in her passing out at work on March 18, 2014. Indeed, the conduct of Mr. Aversano, Mr. Caporrino and the Company has now not only threatened Ms. Abdel-Razeq's professional livelihood and ability to care for her son as a single mother, but her immediate health as well.

5.      This is an action for declaratory, injunctive and monetary relief to redress the unlawful discrimination and retaliation committed against Ms. Abdel-Razeq throughout her employment at A&M in violation of Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981"), the New York State Human Rights Law, N.Y. Executive Law §§ 290 *et seq.* ("NYSHRL") and the New York City Human Rights Law, N.Y. City Administrative Code §§ 8-101 *et seq.* ("NYCHRL").

6.      Defendants' conduct also is in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"). Plaintiff will be filing a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") with regard to these violations, and will file an Amended Complaint following her receipt of a Notice of Right to Sue.

## JURISDICTION AND VENUE

7.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343 as this action involves federal questions regarding the deprivation of Plaintiff's rights under Section 1981. The Court has supplemental jurisdiction over Plaintiff's related claims arising under state law pursuant to 28 U.S.C. § 1367(a).

8.      Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Defendant Alvarez & Marsal, Inc. is a domestic business corporation doing business in the State of New

York and a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this district.

## PARTIES

9.  Plaintiff Maysa Abdel-Razeq is a female employee of Alvarez & Marsal, Inc. in its 600 Madison Avenue, 8th Floor, New York, New York 10022 location.  She is a resident of the State of New Jersey and at all relevant times met the definition of an "employee" and/or "eligible employee" under all applicable statutes.

10.  Defendant Alvarez & Marsal, Inc. is a domestic limited liability company and has a principal place of business at 600 Madison Avenue, 8th Floor, New York, New York 10022. At all relevant times, Defendant Alvarez & Marsal, Inc. met the definition of "employer" and/or a "covered employer" under all relevant statutes.

11.  Defendant Paul Aversano is a resident of the State of New York and Managing Director and Global Practice Leader of the Transaction Advisory Group at Alvarez & Marsal, Inc.  In his capacity as partner, Defendant Aversano directly supervised Ms. Abdel-Razeq's performance from March 2010 to March 18, 2014.  At all relevant times, Defendant Aversano was Ms. Abdel-Razeq's supervisor, and, in that role, he had the authority to discipline and fire Ms. Abdel-Razeq, direct her work activities, assign her job responsibilities and monitor her performance.  At all relevant times, Defendant Aversano was an "employer" within the meaning of all applicable statutes.

12.  Defendant Anthony Caporrino is a resident of the State of New York and a Managing Director in the Transaction Advisory Group at Alvarez & Marsal, Inc.  In his capacity as partner, Defendant Caporrino directly supervised Ms. Abdel-Razeq's performance from March 2010 to March 18, 2014.  At all relevant times, Defendant Caporrino was Ms. Abdel-

Razeq's supervisor, and, in that role, he had the authority to discipline and fire Ms. Abdel-Razeq, direct her work activities, assign her job responsibilities and monitor her performance. At all relevant times, Defendant Caporrino was an "employer" within the meaning of all applicable statutes.

13.     Defendant Joel Poretsky is a resident of the State of New York and General Counsel of Alvarez & Marsal, Inc. In his capacity as General Counsel of the Company, Defendant Poretsky has hiring and firing authority. At all relevant times, Defendant Poretsky was an "employer" within the meaning of all applicable statutes.

## PROCEDURAL REQUIREMENTS

14.     Following commencement of this action, a copy of this Complaint will be served both on the New York City Commission on Human Rights and the Office of the Corporation Counsel of the City of New York, thereby satisfying the notice requirements of the New York City Administrative Code.

15.     Following the commencement of this action, Plaintiff will file a charge of discrimination with the EEOC. Following her receipt of a Notice of Right to Sue, Plaintiff will seek leave to file an Amended Complaint to include claims under Title VII.

16.     Any and all other prerequisites to the filing of this suit have been met.

## FACTUAL ALLEGATIONS

### Sexual Harassment and Discrimination Committed Against Ms. Abdel-Razeq

17.     Ms. Abdel-Razeq commenced her employment at A&M in March 2010, serving as an Executive Assistant to Managing Directors in the Transaction Advisory Group ("TAG") at the Company.

18.    Despite Ms. Abdel-Razeq's dedication to her job, from the beginning of her employment at the Company, A&M and its male-dominated group of Managing Directors have treated her despicably.

19.    Indeed, the treatment to which Ms. Abdel-Razeq has been subjected, largely at the hands of Mr. Aversano, can be characterized as nothing but a concrete effort to create a hostile work environment, including through blatant and pervasive sexual harassment, discrimination and retaliation.

20.    Specifically, from the beginning of her employment at the Company, Mr. Aversano has made the following verbal harassing statements to Ms. Abdel-Razeq:

- Referred to her as "Kim Kardashian";
- Told her she has "baby making hips";
- Compared her body to a "coca-cola bottle";
- Exclaimed: "Damn those watermelons!," referring to Ms. Abdel-Razeq's breasts
- Asked: "How is a woman as beautiful as you still single?";
- Stated: "You look like an ex-girlfriend";
- Told her: "You are a Middle Eastern Queen, but I prefer to call you a Brazilian Queen so I prevent myself from liking a terrorist";
- Warned her that she will be out of a job if she brings a male partner to a Company outing;
- Told her: "You can go out [to run errands] as long as you don't get a Brazilian."
- Repeatedly referred to Jewish people as "Canadians";
- Warned her that she better not be "like Kim Kardashian – a niggerlover";
- Referred to African-American children as "nigglets," which is particularly offensive to Ms. Abdel-Razeq, as her son is half African-American;
- Repeatedly referred to African-Americans as "niggers";
- Asked her out to the movies, to which Ms. Abdel-Razeq always declined;
- Called her "shady" and alleged that she took days off to "fuck a boyfriend that [she is] hiding from [him]";
- Told her that he comes to the office to see her when he does not have a busy schedule to avoid being at his home;
- Informed her: "I will leave my wife for you, but I am worried that you would cheat on me";
- Claimed to her: "I want to spoil you"; and
- Told her that they are going to have sex and that the "first time would be for 30 seconds because [he] would be too excited, and then [they] would go for 3-4 hours."

21.     In addition to his verbal harassing behavior, Mr. Aversano would frequently send Ms. Abdel-Razeq harassing messages over Company email.  By way of example only, on the following dates, Mr. Aversano made the following comments to Ms. Abdel-Razeq via Company email:

- October 11, 2011: "I'm just praying you don't quit or get married!"
- November 15, 2011: "Miss u."
- December 14, 2011: "There is a show on TLC now called the virgin diaries.  It is hilarious.  You have to watch it if you can!"
- December 19, 2011: In response to Ms. Abdel-Razeq informing Mr. Aversano that she had a bad cough: "Sounds like you need some shopping….."
- December 19, 2011: "I know what I am doing on New Years Eve!!!!!," forwarding a TV Schedule of the "Virgin Diaries" movie to Ms. Abdel-Razeq and three other female coworkers (Lismarys Vargas, Jennifer Kim and Carol Fallacaro).
- January 16, 2012: Forwarded email to Ms. Abdel-Razeq and Ms. Vargas with article entitled "Beyonce gets fly with golden booty named after her."
- March 20, 2012: Forwarded email to Ms. Abdel-Razeq regarding a Human Resource webinar entitled: "Turning Around Employees Who Need An Attitude Adjustment."  Mr. Aversano joked: "I'm going to take this class!"
- March 22, 2012: Asked Ms. Abdel-Razeq if she wanted to get a "[c]ouples massage?"
- July 21, 2012: "Hope you are having fun down there…. But not being too Fierce!," referring to Ms. Abdel-Razeq's vacation to attend Ms. Vargas's wedding
- September 9, 2013: "Thank you.  Love, Your Boss and Friend, Paul," in response to Ms. Abdel-Razeq following up on a work assignment.
- September 9, 2013: "Please do.  Just treat him like you treat me," referencing Ms. Abel-Razeq's decision to "ignore" someone.
- October 14, 2013: "Of course I trust you with travel – it's your personal life where I don't trust you!"
- October 24, 2013: "Which ones should I get?," forwarding a Nordstrom's Men's Shop "Pick Your Fit: Jeans for Every Guy" email.
- November 1, 2013: "Maybe this is [your son's] father?," forwarding an article entitled "TSA agent shot at main Los Angeles airport: L.A. Times" and referencing fact that Ms. Abdel-Razeq's son's father is a TSA agent.
- November 7, 2013: "Can you cancel lavo tonight please[?] Change in plans.  Unless you are free and want to have dinner with me?"
- November 14, 2013: "Just take note in case you were planning on harassing me!," forwarding a Company-wide HR email sent in preparation for the annual Company holiday party regarding its Anti-Harassment Policy.

- November 19, 2013: "Figured you would like this," forwarding email regarding Ne-Yo concert and impliedly referencing his accusations that Ms. Abdel-Razeq is a "nigger lover."
- December 3, 2013: "Just in case you were wondering what to get the man that has (almost) everything…," forwarding Nordstrom Men's Shop email regarding "Top Gifts for Guys."
- December 4, 2013: "As long as you never lie to me or steal from me you'll always have my love… Those are my two rules."
- December 28, 2013: "Join me on Wickr. Download this app and let's use this from now on. Way more secure than bbm." Ms. Abdel-Razeq refused to download the app.
- February 3, 2014: "Hey – you had [an] all expense paid birthday trip if you wanted it – but you don't like spending time with me!," referring to his offer to Ms. Abdel-Razeq's decline of invitation to attend annual A&M offsite retreat.

22. Additionally, Mr. Aversano has subjected Ms. Abdel-Razeq to unwanted touching, including rubbing her shoulders and smelling her hair – all for others to witness.

23. Disturbingly, Ms. Abdel-Razeq is not the only victim of Mr. Aversano's sexual harassment. Mr. Aversano's harassing conduct is common knowledge in the office and discussed amongst female employees, including HR representatives.

24. Indeed, other A&M employees have previously complained to HR regarding Mr. Aversano's pervasive and severe harassing behavior and the hostile work environment he has created at the Company.

25. However, HR representatives merely chalk it up to the fact that this is just "the way he is" and that Ms. Abdel-Razeq just had to learn to "be political" in order to deal with him.

26. In addition to these pervasive, offensive and degrading sexual and racist remarks and sexual advances, Mr. Aversano's discriminatory treatment toward Ms. Abdel-Razeq consisted of cyclical patterns of sexual harassment and sexual advances followed by retaliation for Ms. Abdel-Razeq's rejection of these advances.

27.     This cycle would begin every January, around the time of Ms. Abdel-Razeq's birthday, which was also the time of year Ms. Abdel-Razeq would help plan the Company's offsite retreat for Managing Directors.

28.     During that time period each year, Mr. Aversano would tell Ms. Abdel-Razeq that he wanted to "spoil" her on her birthday.

29.     Moreover, Mr. Aversano would pressure and bribe her to attend the offsite retreat, demanding that she fly first class seated next to him.

30.     His disturbing behavior also included demanding Ms. Abdel-Razeq to arrange her hotel room to be immediately next to his.

31.     Terrified that she would be trapped in a situation alone with him at the retreat, Ms. Abdel-Razeq always declined these invitations.

32.     In an obvious effort to pressure Ms. Abdel-Razeq to submit to his sexual desires, Mr. Aversano would frequently remind her that her attendance at the offsite retreats would be instrumental to her career at the Company.

33.     Then, immediately after she declined his demands, Mr. Aversano would embark on a campaign of retaliation against Ms. Abdel-Razeq.

34.     These campaigns were marked by Mr. Aversano isolating Ms. Abdel-Razeq and then scolding and deliberately overloading her with work demands far exceeding those of any other Executive Assistant.

35.     For instance, all other Executive Assistants at A&M, including Ms. Abdel-Razeq prior to her rejections of Mr. Aversano, report to approximately five to seven Managing Directors.  However, after Ms. Abdel-Razeq's rejections and complaints, Mr. Aversano has required Ms. Abdel-Razeq to report to 11 to 12 Managing Directors.

36.     Moreover, on one occasion, in or around February or March 2013, shortly after Ms. Abdel-Razeq had declined to attend the annual offsite retreat, Ms. Abdel-Razeq went on a family trip to celebrate her sister's birthday.

37.     While on vacation, Mr. Aversano texted Ms. Abdel-Razeq and demanded her to send him pictures of her in a bikini.

38.     Upon her return from the trip, Mr. Aversano immediately retaliated against Ms. Abdel-Razeq, scolding her for taking a day off of work and basing this act of retaliation on a lie; namely, that she had not properly informed any Managing Director of her plans.

39.     Ms. Abdel-Razeq had, in fact, properly requested the day off per Company policy.

40.     On March 1, 2013, terrified that her job was in jeopardy regardless, Ms. Abdel-Razeq informed Mr. Aversano via Company email that she was cancelling a future trip because of his conduct.  Specifically, she complained to Mr. Aversano: "I am officially very uncomfortable after our conversation yesterday.  I am disappointed but will continue to do my work and handle everything the way I have been for the team."

**Retaliation Against Ms. Abdel-Razeq**

41.     Despite Ms. Abdel-Razeq's direct complaint to Mr. Aversano, the blatant sexual harassment, discrimination and retaliation campaign he waged against her only continued to escalate throughout her employment at the Company, reaching an emotional breaking point in the spring of 2014 when another cycle of harassment, rejection and retaliation started anew.

42.     Specifically, on January 30, 2014, Mr. Aversano invited several Managing Directors to whom Ms. Abdel-Razeq reported out to lunch to celebrate Ms. Abdel-Razeq's birthday.

43.     As everyone at the table ordered soup, Mr. Aversano announced to the waiter –
for all attendees to hear – that he and Ms. Abdel-Razeq only needed one spoon, as they would be
sharing.

44.     As the meal came to a close and Ms. Abdel-Razeq blew out her birthday candle,
Mr. Aversano abruptly exclaimed – again for all to hear and witness – "Your wish is here next to
you!  Now your life is set!"

45.     Two other Managing Directors at the table, Mr. Caporrino (godfather to one of
Mr. Aversano's children) and Victoria Whitman (another Managing Director), found great
amusement in watching this public display of harassment, which only served to increase Ms.
Abdel-Razeq's feelings of embarrassment, humiliation and degradation.

46.     Once back at the office, Mr. Aversano's harassment of Ms. Abdel-Razeq did not
stop.

47.     Mr. Aversano swiftly called Ms. Abdel-Razeq into his office, with the door open
for Ms. Abdel-Razeq's colleagues to hear the entire conversation.

48.     Mr. Aversano continued to pressure Ms. Abdel-Razeq to entertain his advances,
telling her: "Now you are 30.  You need to think about your future and have a male figure for
your son."

49.     Ms. Abdel-Razeq, mustering the courage to stand up for her own dignity,
exclaimed: "Stop it!  I can't take it anymore!" and headed to exit his office.  Mr. Aversano,
infuriated by Ms. Abdel-Razeq's decision to stand up for herself and once again reject his sexual
advances, shouted, "Fuck!," and slammed the door behind Ms. Abdel-Razeq.

50.     Ms. Abdel-Razeq burst into tears as she headed to her desk with everyone
watching her.

51.     Like clockwork, over the next few weeks, Mr. Aversano began waging another crusade of retaliation against Ms. Abdel-Razeq, including reporting alleged unprofessional behavior and performance deficiencies to HR.

52.     For example, Mr. Aversano falsely alleged that Ms. Abdel-Razeq was not reporting to work, which Ms. Abdel-Razeq has been able to conclusively refute to HR through electronic evidence.

53.     Mr. Aversano also began holding meetings and exchanging communications with other Managing Directors, including Mr. Caporrino, regarding Ms. Abdel-Razeq's manufactured poor work habits and attendance.

54.     In response, on or around February 28, 2014, HR called Ms. Abdel-Razeq into a meeting with Mr. Caporrino and Maria Coccaro, Chief HR Officer, to discuss Ms. Abdel-Razeq's supposed deficient work performance.

55.     In the middle of the meeting, Ms. Abdel-Razeq summoned the courage to ask Ms. Coccaro if she could speak privately regarding the allegations and her situation at the Company.

56.     During their private meeting, Ms. Abdel-Razeq complained to Ms. Coccaro regarding some of the many harassing comments and conduct that Mr. Aversano had directed toward Ms. Abdel-Razeq over the years.

57.     Incredibly, Ms. Coccaro's responded: "I am the Head of HR and he treats me like this."

58.     Not surprisingly then, but very unfortunately, HR took no bona fide remedial actions against Mr. Aversano.

59.     To the contrary, HR, Mr. Caparrino and other Managing Directors have assisted Mr. Aversano in creating a false paper-trail of Ms. Abdel-Razeq's alleged underperformance in

retaliation for her refusal to accede to Mr. Aversano's demands and for complaining of his unlawful discriminatory and harassing conduct.

60.    Specifically, Ms. Abdel-Razeq was brought into another meeting on or around March 4, 2014 with Mr. Caporrino and Ms. Coccaro to discuss her work performance.

61.    Following the meeting, Mr. Caporrino placed a public bulls eye on Ms. Abdel-Razeq's back by sending an email to all of the Managing Directors to whom she reports, insinuating that she was not following proper Company protocol regarding her work schedule and time off and reminding them that they "should all get the necessary support" from her that they require.

62.    Mr. Caporrino also separately encouraged Managing Directors to report to him any feedback that they had regarding Ms. Abdel-Razeq, which he would then forward on to HR.

63.    However, any negative feedback is demonstrably false, and has been expressly contradicted by others to whom Ms. Abdel-Razeq reports.

64.    By way of example only, on February 22, 2014, Jeff Feinberg, another Managing Director in A&M's Private Equity Services – Operations Group ("PEPI"), emailed Ms. Coccaro and praised Ms. Abdel-Razeq: "I wanted to let you know how helpful [Ms. Abdel-Razeq] was during [Ms. Vargas's] absence . . . Though she was supporting 15 TAG [Managing Directors], she never said 'no' when any of the NY PEPI MD's needed anything . . . She worked late when needed and was responsive on weekends.  I don't think we could have made it without her."

65.    Additionally, Mr. Caporrino himself admitted in his meeting with Ms. Coccaro and Ms. Abdel-Razeq that "it's not easy working for 10-11 people" and told her: "You're doing a great job.  When you do things, you don't make mistakes, you don't screw up.  You are very dependable."

66.     Despite all evidence to the contrary of Mr. Caporrino's and Mr. Aversano's allegations, astonishingly, rather than disciplining or taking any remedial action against Mr. Aversano or other retaliating conspirators, including Mr. Caporrino, the Company chose to discipline and lecture Ms. Abdel-Razeq regarding her conduct instead of punishing the true wrongdoers.

67.     Indeed, shortly after the meeting in which Ms. Abdel-Razeq expressly complained to Ms. Coccaro regarding the discrimination and retaliation she had suffered at the Company, Ms. Coccaro simply told Ms. Abdel-Razeq: "Cross your T's and dot your I's.  You just can't give him a reason to fire you."

68.     During the same conversation, Ms. Coccaro also asked Ms. Abdel-Razeq if she had sought legal representation, clearly demonstrating that the Company knows full well that it could face substantial legal liability for its actions.

69.     Ms. Coccaro had, in fact, consulted Daniel Feigenbaum, Deputy General Counsel, regarding the situation.

70.     However, consistent with all other sham measures taken by the Company to address the deplorable discriminatory and retaliatory treatment of Ms. Abdel-Razeq, such action proved fruitless.

71.     Tellingly, Mr. Aversano already voiced his "disappoint[ment]" to Ms. Coccaro regarding her decision to bring this matter to the attention of Mr. Feigenbaum, who is Mr. Aversano's brother-in-law, writing in a Company email on March 3, 2014: "So you spoken to Dan Feignbaum I hear?  I'm disappointed that you would do that."

72.     It is all too clear that any complaints made by Ms. Abdel-Razeq were entirely futile, as other Company employees' complaints to HR have previously proven to be.

73.     Indeed, Mr. Aversano continued to harass Ms. Abdel-Razeq since her protected complaints to Mr. Aversano, Mr. Caporrino, and HR, asking her: "What's cooking, good looking?"

74.     Ms. Abdel-Razeq specifically reported Mr. Aversano's "What's cooking, good looking?" comment to Ms. Coccaro in their private meeting on or around March 3, 2014, leading Ms. Coccaro to admit to Ms. Abdel-Razeq that Mr. Aversano was a "risk" to the Company.

75.     Specifically, Ms. Coccaro told Ms. Abdel-Razeq: "[J]ust to make it easier and so you understand how it all works and what my duty is, there's a risk here.  There's a risk here that you could . . . file a claim . . . So I spoke to my legal counsel . . . I said, '[Mr. Aversano] needs to reign himself in,' so I've been coaching [Mr. Aversano] . . . I said [to Mr. Aversano], 'be very mindful about how you speak.'"  Ms. Coccaro also told Ms. Abdel-Razeq: "I need to protect the firm against [Mr. Aversano] … so that's my role, so you know HR's role in all of this."

76.     Moreover, Ms. Coccaro stated to Ms. Abdel-Razeq: "[I]t's very common that someone in your position does not want to go into it because of the same fears.  He's powerful. He manages all of these guys . . . [you] don't want to be in that situation, I respect that.  It's not uncommon . . . It's probably the most common thing . . . I just told [Mr. Aversano], 'don't . . . give too many compliments … it's making [Ms. Abdel-Razeq] feel uncomfortable.'"

77.     Furthermore, Ms. Abdel-Razeq had a private meeting with HR's Director of Benefits, Rosa Dailly, on or around March 10, 2014.

78.     During this meeting, Ms. Abdel-Razeq made the following complaints to Ms. Dailly regarding specific instances of sexual harassment, discrimination and retaliation committed by Mr. Aversano:

- Mr. Aversano recently stated to her: "I have to figure out a way to hate you" in order for him to enjoy a vacation with his family."

- Mr. Aversano was "pissed off" on Valentine's Day of 2014 because he was thinking, "Oh, [Ms. Abdel-Razeq] has a boyfriend."
- Mr. Aversano was "trying to retaliate . . . trying to find a way to get [Ms. Abdel-Razeq out" and was "pissed off" at her, although she "didn't do anything to him except for him telling 'No' [on her birthday] for the fifty-millionth time, but this time [she] was more aggressive with it.  Like to say, 'I'm uncomfortable.  Stop it.' Like, you turn 30, and on your birthday, you're crying because your boss is saying 'Fuck you!' and [your coworkers] are looking at you . . . "

79.     In response to Ms. Abdel-Razeq's complaints, Ms. Dailly told Ms. Abdel-Razeq to simply "tune [Mr. Aversano] out," that "there is politics" and that "it's going to blow over."

80.     The retaliation against Ms. Abdel-Razeq, however, has not blown over since she has made numerous protected complaints to Mr. Aversano, Mr. Caporrino and HR.

81.     On March 18, 2014, Ms. Abdel-Razeq passed out at work.

82.     Hospitalized immediately, Ms. Abdel-Razeq, a two-time cancer survivor, was diagnosed with low red blood cell count and a Stage 1 heart condition, which her physician attributed to her acute level of anxiety associated with her hostile work environment.

83.     Given that this condition makes it far more likely that a cancer survivor will relapse, Ms. Abdel-Razeq's oncologist refused to consent to her return to work.

84.     Years of being subjected to sexual harassment, discrimination and retaliation at the hands of her supervisor and with the assistance of the Company's HR and legal departments has now not only threatened Ms. Abdel-Razeq's professional livelihood and ability to care for her son as a single mother, but her immediate health as well.

85.     To add insult to injury, the Company continued to retaliate against Ms. Abdel-Razeq since her widely known hospitalization.

86.     Indeed, HR, at the request of Mr. Aversano and Mr. Caporrino, even went so far as to demand Ms. Abdel-Razeq to return her laptop while she was out on short-term disability, a completely unprecedented request for an employee on leave and a clear attempt by the Company

to further isolate Ms. Abdel-Razeq from the Company and to cover up any wrongdoing by the Company and its senior executives.

87.     Furthermore, after the Company was notified of Ms. Abdel-Razeq's decision to seek legal representation, it retaliated further against her by way of senior-level managers, including the Chief Executive Officer ("CEO"), Bryan Marsal, speaking to other employees regarding Ms. Abdel-Razeq in a disparaging manner, including accusing Ms. Abdel-Razeq of being money hungry.

88.     In response, on June 3, 2014, Ms. Abdel-Razeq's counsel warned the Company's Associate General Counsel, Sarah Jensen, that such acts constituted unlawful retaliation and urged her to communicate to Mr. Marsal, as well as all other senior-level management, that they must cease and desist from making any further derogatory comments regarding Ms. Abdel-Razeq.

89.     Additionally, despite the objection by Ms. Abdel-Razeq's counsel, Defendants continued their campaign of retaliation by falsely accusing Ms. Abdel-Razeq of wrongfully obtaining her Company laptop and again demanding Ms. Abdel-Razeq to turn over her Company laptop and Blackberry or else face the threat of termination.

90.     Furthermore, Defendants engaged in further retaliation as recently as July 22, 2014, a day on which Ms. Abdel-Razeq was forced to the hospital due to her increased anxiety over her unlawful mistreatment by Defendants.

91.     Specifically, Defendant Poretsky stated in the Company's office that he intended to "make [Ms. Abdel-Razeq's] life miserable." Defendant Poretsky further stated that he would ensure that the Company would dock Ms. Abdel-Razeq's pay for her inability to report to work on July 21, 2014, which Defendants knew was because Ms. Abdel-Razeq's health condition

required hospitalization on that day and Ms. Abdel-Razeq had medical documentation to prove as much.

92.    As a result of the hostile work environment caused by the incessant sexual harassment and sexual advances of Mr. Aversano, as well as the retaliation she has suffered in response to her complaints regarding this deplorable treatment, Ms. Abdel-Razeq has suffered – and continues to suffer – from severe emotional distress.

93.    Defendants' conduct can be defined as nothing short of unlawful discriminatory actions constituting malicious, willful and wanton behavior in violation of Ms. Abdel-Razeq's legal right to work in an employment setting free of unlawful discrimination, sexual harassment and retaliation.

**FIRST CAUSE OF ACTION**
**(Discrimination in Violation of Section 1981)**
**(Against Defendants A&M and Aversano)**

94.    Plaintiff repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

95.    Defendants A&M and Aversano have discriminated against Plaintiff on the basis of her race and/or color in violation of Section 1981 by denying her the same terms and conditions of employment available to employees who are White, including, but not limited to, subjecting her to disparate working conditions and repeatedly subjecting her to racist and anti-Semitic comments.

96.    As a direct and proximate result of Defendants A&M and Aversano's unlawful discriminatory conduct in violation of Section 1981, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, including, but not limited to, loss of future income, compensation and benefits for which she is entitled to an award of damages.

97.     As a direct and proximate result of Defendants A&M and Aversano's unlawful discriminatory conduct in violation of Section 1981, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which she is entitled to an award of damages.

98.     Defendants A&M and Aversano's unlawful and discriminatory actions constitute malicious, willful and wanton violations of Section 1981 for which Plaintiff is entitled to an award of punitive damages.

## SECOND CAUSE OF ACTION
### (Discrimination and Harassment in Violation of the NYSHRL)
### (Against Defendants A&M and Aversano)

99.     Plaintiff repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

100.    By the actions described above, among others, Defendants A&M and Aversano discriminated against Plaintiff on the basis of her sex in violation of the NYSHRL by denying Plaintiff the same terms and conditions of employment available to male employees, including, but not limited to, denying her the opportunity to work in an employment setting free of unlawful discrimination and sexual harassment, leading to her constructive discharge.

101.    Defendants A&M and Aversano have discriminated against Plaintiff on the basis of her sex in violation of the NYSHRL by creating, fostering, condoning, accepting, ratifying and/or otherwise failing to prevent or to remedy a hostile work environment.

102.    As a direct and proximate result of Defendants A&M and Aversano's unlawful conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation,

embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain

and suffering for which she is entitled to an award of monetary damages and other relief.

### THIRD CAUSE OF ACTION
**(Discrimination in Violation of the NYSHRL)**
**(Against Defendants A&M and Aversano)**

103.    Plaintiff repeats and re-alleges each and every allegation in all of the preceding

paragraphs as if fully set forth herein.

104.    Defendants A&M and Aversano have discriminated against Plaintiff on the basis

of her race and/or color in violation of NYSHRL by denying her the same terms and conditions

of employment available to employees who are White, including, but not limited to, subjecting

her to disparate working conditions and racist and anti-Semitic comments.

105.    As a direct and proximate result of Defendants A&M and Aversano's unlawful

discriminatory conduct in violation of NYSHRL, Plaintiff has suffered, and continues to suffer,

monetary and/or economic harm, including, but not limited to, loss of future income,

compensation and benefits for which he is entitled to an award of damages.

106.    As a direct and proximate result of Defendants A&M and Aversano's unlawful

discriminatory conduct in violation of NYSHRL, Plaintiff has suffered, and continues to suffer,

mental anguish and emotional distress, including, but not limited to, depression, humiliation,

embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain

and suffering for which she is entitled to an award of damages.

### FOURTH CAUSE OF ACTION
**(Retaliation in Violation of the NYSHRL)**
**(Against All Defendants)**

107.    Plaintiff repeats and re-alleges each and every allegation in all of the preceding

paragraphs as if fully set forth herein.

108.   By the actions described above, among others, Defendants retaliated against Plaintiff on the basis of her protected activities in violation of the NYSHRL by, *inter alia*, manufacturing a false paper-trail of her purported work attendance issues and reporting such alleged performance deficiencies to HR, demanding confiscation of her Company laptop and Blackberry when she was still a current employee and publicly declaring that they intend to "make [Ms. Abdel-Razeq's] life miserable" by, including, but not limited to, docking her pay.

109.   As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or other economic harm for which she is entitled to an award of monetary damages and other relief.

110.   As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which she is entitled to an award of monetary damages and other relief.

**FIFTH CAUSE OF ACTION**
**(Aiding and Abetting in Violation of the NYSHRL)**
**(Against Defendant Caporrino)**

111.   Plaintiff hereby repeats, reiterates, and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

112.   Defendant Caporrino directly participated in the discriminatory conduct perpetrated against Plaintiff, including, but not limited to, manufacturing a false paper-trail of Ms. Abdel-Razeq's purported work attendance issues, reporting such alleged performance deficiencies to HR and demanding confiscation of her Company laptop and Blackberry when she was still a current employee.

113.   At all relevant times, Defendant Caporrino was a Managing Director in the Company's Transaction Advisory Group and had the ability to control the terms and conditions of her employment, including, but not limited to, the power to terminate Plaintiff's employment.

114.   Defendant Caporrino knowingly or recklessly aided and abetted the unlawful discrimination and retaliation against Plaintiff in violation of the NYSHRL, including, but not limited to, manufacturing a false paper-trail of Ms. Abdel-Razeq's purported work attendance issues, reporting such alleged performance deficiencies to HR and demanding confiscation of her Company laptop and Blackberry when she was still a current employee.

115.   As a direct and proximate result, Plaintiff has suffered, and continues to suffer, monetary and/or economic damages, including, but not limited to, loss of past and future income for which Plaintiff is entitled to an award of damages.

116.   As a direct and proximate result, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence and emotional pain and suffering for which Plaintiff is entitled to an award of damages.

## SIXTH CAUSE OF ACTION
### (Aiding and Abetting in Violation of the NYSHRL)
### (Against Defendant Poretsky)

117.   Plaintiff hereby repeats, reiterates, and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

118.   Defendant Poretsky directly participated in the discriminatory conduct perpetrated against Plaintiff, including, but not limited to, publicly declaring that he intends to "make [Ms. Abdel-Razeq's] life miserable" by, including, but not limited to, docking her pay.

119.   At all relevant times, Defendant Poretsky was General Counsel of the Company and had the ability to control the terms and conditions of her employment, including, but not limited to, the power to terminate Plaintiff's employment.

120.   Defendant Poretsky knowingly or recklessly aided and abetted the unlawful discrimination and retaliation against Plaintiff in violation of the NYSHRL, including, but not limited to, publicly declaring that he intends to "make [Ms. Abdel-Razeq's] life miserable" by, including, but not limited to, docking her pay.

121.   As a direct and proximate result, Plaintiff has suffered, and continues to suffer, monetary and/or economic damages, including, but not limited to, loss of past and future income for which Plaintiff is entitled to an award of damages.

122.   As a direct and proximate result, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence and emotional pain and suffering for which Plaintiff is entitled to an award of damages.

## SEVENTH CAUSE OF ACTION
### (Discrimination and Harassment in Violation of the NYCHRL)
### (Against Defendants A&M and Aversano)

123.   Plaintiff hereby repeats and re-alleges each and every allegation in the preceding paragraphs as if set forth fully herein.

124.   Defendants have discriminated against Plaintiff on the basis of her sex in violation of the NYCHRL by denying her equal terms and conditions of employment, including, but not limited to, denying her the opportunity to work in an employment setting free of unlawful discrimination and sexual harassment, leading to her constructive termination.

125.   Defendants have discriminated against Plaintiff on the basis of her sex in violation of the NYCHRL by creating, fostering, condoning, accepting, ratifying and/or otherwise failing to prevent or to remedy a hostile work environment.

126.   As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, monetary and/or other economic harm for which she is entitled an award of monetary damages and other relief.

127.   As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which she is entitled to an award of monetary damages and other relief.

128.   Defendants' unlawful discriminatory actions constitute malicious, willful and wanton violations of NYCHRL for which Plaintiff is entitled to an award of punitive damages.

## EIGHTH CAUSE OF ACTION
### (Discrimination in Violation of the NYCHRL)
### (Against Defendants A&M and Aversano)

129.   Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

130.   Defendants A&M and Aversano have discriminated against Plaintiff on the basis of her race and/or color in violation of NYCHRL by denying her the same terms and conditions of employment available to employees who are White, including, but not limited to, subjecting her to disparate working conditions and repeatedly subjecting her to racist and anti-Semitic comments.

131.    As a direct and proximate result of Defendants A&M and Aversano's unlawful discriminatory conduct in violation of NYCHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, including, but not limited to, loss of future income, compensation and benefits for which she is entitled to an award of damages.

132.    As a direct and proximate result of Defendants A&M and Aversano's unlawful discriminatory conduct in violation of NYCHRL, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which she is entitled to an award of damages.

133.    Defendants A&M and Aversano's unlawful and discriminatory actions constitute malicious, willful and wanton violations of the NYCHRL for which Plaintiff is entitled to an award of punitive damages.

**NINTH CAUSE OF ACTION**
**(Retaliation in Violation of the NYCHRL)**
**(Against All Defendants)**

134.    Plaintiff hereby repeats and re-alleges each and every allegation in the preceding paragraphs as if set forth fully herein.

135.    By the actions described above, among others, Defendants retaliated against Plaintiff on the basis of her protected activities in violation of the NYCHRL by, *inter alia*, manufacturing a false paper-trail of her purported work attendance issues, reporting such alleged performance deficiencies to HR, demanding confiscation of her Company laptop and Blackberry when she was still a current employee and publicly declaring that they intend to "make [Ms. Abdel-Razeq's] life miserable" by, including, but not limited to, docking her pay.

136.   As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, monetary and/or other economic harm for which she is entitled an award of monetary damages and other relief.

137.   As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which she is entitled to an award of monetary damages and other relief.

138.   Defendants' unlawful retaliatory actions constitute malicious, willful and wanton violations of NYCHRL for which Plaintiff is entitled to an award of punitive damages.

**TENTH CAUSE OF ACTION**
**(Aiding and Abetting in Violation of the NYCHRL)**
**(Against Defendant Caporrino)**

139.   Plaintiff hereby repeats and re-alleges each and every allegation in the preceding paragraphs as if set forth fully herein.

140.   Defendant Caporrino directly participated in the discriminatory conduct perpetrated against Plaintiff, including, but not limited to, manufacturing a false paper-trail of Ms. Abdel-Razeq's purported work attendance issues, reporting such alleged performance deficiencies to HR and demanding confiscation of her Company laptop and Blackberry when she was still a current employee.

141.   At all relevant times, Defendant Caporrino was a Managing Director in the Company's Transaction Advisory Group and had the ability to control the terms and conditions of her employment, including, but not limited to, the power to terminate Plaintiff's employment.

142.   Defendant Caporrino knowingly or recklessly aided and abetted the unlawful discrimination against Plaintiff in violation of the NYCHRL, including, but not limited to, manufacturing a false paper-trail of Ms. Abdel-Razeq's purported work attendance issues, reporting such alleged performance deficiencies to HR and demanding confiscation of her Company laptop and Blackberry when she was still a current employee.

143.   As a direct and proximate result, Plaintiff has suffered, and continues to suffer, monetary and/or economic damages, including, but not limited to, loss of past and future income for which Plaintiff is entitled to an award of damages.

144.   As a direct and proximate result, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence and emotional pain and suffering for which Plaintiff is entitled to an award of damages.

145.   Defendant Caporrino's unlawful and discriminatory conduct constitutes a knowing, malicious, willful and wanton violation of the NYCHRL for which Plaintiff is entitled to an award of punitive damages.

### ELEVENTH CAUSE OF ACTION
### (Aiding and Abetting in Violation of the NYCHRL)
### (Against Defendant Poretsky)

146.   Plaintiff hereby repeats and re-alleges each and every allegation in the preceding paragraphs as if set forth fully herein.

147.   Defendant Poretsky directly participated in the discriminatory conduct perpetrated against Plaintiff, including, but not limited to, publicly declaring that he intends to "make [Ms. Abdel-Razeq's] life miserable" by, including, but not limited to, docking her pay.

148.    At all relevant times, Defendant Poretsky was General Counsel of the Company and had the ability to control the terms and conditions of her employment, including, but not limited to, the power to terminate Plaintiff's employment.

149.    Defendant Poretsky knowingly or recklessly aided and abetted the unlawful discrimination against Plaintiff in violation of the NYCHRL, including, but not limited to, but not limited to, publicly declaring that he intends to "make [Ms. Abdel-Razeq's] life miserable" by, including, but not limited to, docking her pay.

150.    As a direct and proximate result, Plaintiff has suffered, and continues to suffer, monetary and/or economic damages, including, but not limited to, loss of past and future income for which Plaintiff is entitled to an award of damages.

151.    As a direct and proximate result, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence and emotional pain and suffering for which Plaintiff is entitled to an award of damages.

152.    Defendant Poretsky's unlawful and discriminatory conduct constitutes a knowing, malicious, willful and wanton violation of the NYCHRL for which Plaintiff is entitled to an award of punitive damages.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that the Court enter judgment in her favor and against Defendants for the following relief:

A.      A declaratory judgment that the actions, conduct and practices of Defendants complained of herein violate the laws of the United States, the State of New York and the City of New York;

B.    An injunction and order permanently restraining Defendants and its partners, officers, owners, agents, successors, employees and/or representatives, and any and all persons acting in concert with them, from engaging in any such further unlawful conduct, including the policies and practices complained of herein;

C.    An award of damages against Defendants, in an amount to be determined at trial, plus prejudgment and postjudgment interest, to compensate Plaintiff for all monetary and/or economic harm, including, but not limited to, loss of income, earned bonus pay, reputational harm and harm to professional reputation; for harm to her professional and personal reputations and loss of career fulfillment; for all non-monetary and/or compensatory harm, including, but not limited to, compensation for physical injury, pain and suffering, serious psychological and emotional distress, mental anguish, stress and anxiety, embarrassment and humiliation; all other monetary and/or non-monetary losses suffered by Plaintiff;

D.    An award of punitive damages in an amount to be determined at trial;

E.    An award of costs that Plaintiff has incurred in this action, including, but not limited to, expert witness fees, as well as Plaintiff's reasonable attorneys' fees and costs to the fullest extent permitted by law; and

F.    Such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: July 23, 2014
       New York, New York

                           Respectfully submitted,

                           **WIGDOR LLP**

                           By: _____
                                 Douglas H. Wigdor

                           85 Fifth Avenue
                           New York, New York 10003
                           Telephone: (212) 257-6800
                           Facsimile: (212) 257-6845
                           dwigdor@wigdorlaw.com

                           **GOODSTADT LAW GROUP, PLLC**

                           Andrew S. Goodstadt

                           520 Eighth Avenue, 14th Floor
                           New York, New York 10018
                           Telephone: (646) 430-8295
                           Facsimile: (646) 430-8294
                           agoodstadt@goodstadtlaw.com

                           *Counsel for Plaintiff*